

SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re: | Case No. 21-00222 |
| | Chapter 7 |
| MARYLIN FELIPE CSIGI, | |
| Debtor. | |
| VILLA PONCE, TRUSTEE OF THE FILOMENA D. FELIPE TRUST, DATED JANUARY 25, 2014, | Adv. Pro. No. 21-90012 |
| Plaintiff, | |
| vs. | |
| MARYLIN FELIPE CSIGI, | |
| Defendant. | |

# FINDINGS OF FACT AND CONCLUSIONS OF LAW
# <u>ON NONDISCHARGEABILITY CLAIMS</u>

Plaintiff Villia Ponce and defendant Marylin Felipe Csigi are sisters.

Marylin[1] was the trustee of her mother's trust. A state court ruled that Marylin breached her fiduciary duties as trustee and misappropriated trust assets, removed Marylin as trustee, appointed Villia as successor trustee, and ruled that the amount for which Marylin would be surcharged would be decided after a trial. Marlin filed this bankruptcy case before the state court held the trial. Villia now asks this court to determine the amount of Marylin's liability to the trust and to rule that the debt is not dischargeable in bankruptcy.

The trial in this adversary proceeding took place on November 1, 2, 4, and 8, 2022. Mark M. Murakami and Nicholas K. Ernst represented Villia and Ofir Raviv and Frank Cioffi represented Marylin.

## I. FINDINGS OF FACT

### A. The Parties

Filomena D. Felipe ("Mother") was born on November 28, 1923. She had eleven children with her husband (who predeceased her). Her children

---

[1] I will refer to most of the parties by their first names strictly for convenience. I mean no disrespect.

U.S. Bankruptcy Court - Hawaii   #21-90012   Dkt # 76   Filed  12/09/22   Page 2 of 32

are Corazon, Norma, Dionisio, Lolita, Melita, Remigio, Villia, Marylin, Andrea, Roger, and Imelda.

To say that Villia, Marylin, and their siblings have a dysfunctional relationship would be a gross understatement. Their loathing for each other was obvious at trial and tainted every witness' credibility. Most of the witnesses insisted on airing grievances against one another that have nothing to do with the legal issues presented in this case.

### B. Mother's Initial Care and Estate Plan

Mother suffered a stroke in 2005. She became wheelchair-bound and required assistance with most activities of daily life. Despite her condition, she continued to live in her own home in Kailua for several years under the care of her son Remigio.

In March 2013, Marylin and some of her siblings decided that Remigio was not caring for Mother properly. Marylin and her cousin's wife then removed Mother from Mother's Kailua home. Until the end of the year, Mother spent alternate months in the homes of Melita and Marylin. Around January 2014, Mother moved into Marylin's house and stayed

3

there for the rest of her life.

Marylin provided excellent care for Mother's physical and mental well-being. Mother lived a long life and was healthy considering her age and disability. Providing this care imposed a significant physical, psychological, and (for a time) financial burden on Marylin and her husband and children.

When Mother moved into Marylin's house, Mother's only assets were her Kailua house and a small amount of money in a bank account. Her income consisted of a modest Social Security benefit and some rents from her house.[2]

On January 25, 2014, Mother signed a set of estate planning documents. These included a revocable living trust and instruments transferring her Kailua house and other assets into the trust. She named herself "primary trustee" of the trust and Marylin and Corazon co-successor trustees of the trust. She declared that "[m]y successor trustee(s)

_____

[2] The Kailua property housed Remigio and other tenants. There is conflicting testimony as to which sibling collected rent from the tenants and what happened to the rent payments when collected.

4

are to serve without compensation, unless compensation is agreed upon by all of the remainder beneficiaries of this trust. However, all expenses of any type incurred by my successor trustee(s) in carrying out duties under this trust shall be paid for from the trust." She also designated herself as the "primary beneficiary" of the trust and provided that "[a]s long as I shall live, I will have the exclusive right to the use and benefit of the income and the assets of this trust." She authorized the successor trustee(s) "to make gifts from this trust to third parties or to the successor trustee(s) as individual(s) as determined in the sole discretion of the successor trustee(s)," provided that the gifts complied with certain tax laws.

Only a few months later, on May 14, 2014, Mother amended her estate plan. She resigned as primary trustee of her trust and designated Marylin as the sole successor trustee, with Corazon as alternate successor trustee in case Marylin was unable or unwilling to serve. All other provisions of the trust remained the same.

### C. Mother's Mental Condition in 2014

By the spring of 2014, Mother's mental capabilities had begun to

U.S. Bankruptcy Court - Hawaii   #21-90012   Dkt # 76   Filed  12/09/22   Page 5 of 32

decline.

Some of the notes kept by her primary care physician, Dr. Marina Badua, say that Mother suffered from senile dementia and confusion as early as September 2013. But other notes taken by Dr. Badua during this period do not mention dementia. And Dr. Badua also wrote a series of letters that give an inconsistent account of Mother's mental condition. On January 21, 2014, Dr. Badua provided a letter detailing that Mother "now is 90 years old and becoming forgetful, confused, and disoriented at this time and I feel that she is no longer mentally competent to manage her personal and financial affairs." Only two days later (and two days before Mother signed the January 2014 estate planning documents), Marylin brought Mother to Dr. Badua who then provided a letter saying that Mother "is oriented to time, place and person." A few months later, on May 8, 2014 (shortly before Mother changed her estate plan), Dr. Badua wrote that Mother "is oriented to time, place and person and found to be mentally competent to make decisions on her own." Dr. Badua's later notes from 2015, 2017, and 2018, however, consistently indicate that Mother suffered

6

from dementia.

Dr. Badua's notes in the medical record are more reliable than her letters. Dr. Badua probably wrote the second and third letters at the request or one or more of the siblings for the specific purpose of validating the estate planning documents that Mother signed shortly after Dr. Badua wrote those letters. In contrast, Dr. Badua probably wrote the notes in the medical record for her own use in caring for Mother, and not at anyone else's request or suggestion.

Mother's estate planning documents, including the amendment, were prepared by an experienced attorney who spoke fluent Ilocano and met with Mother privately. (Ilocano was Mother's native language; her English language skills were limited.) He found her to be competent and wrote a letter to this effect to Melita, the holder of Mother's previous power of attorney.

Considering all of the evidence and the surrounding circumstances, I find that, during the spring of 2014, Mother's mental condition had begun to deteriorate but she was able to make rational decisions on her own

U.S. Bankruptcy Court - Hawaii   #21-90012   Dkt # 76   Filed 12/09/22   Page 7 of 32

behalf. After 2014, Mother's mental condition continued to deteriorate. Marylin knew of this decline; she spent nearly every waking hour with Mother and was attentive to her needs, so she could not have missed the signs of Mother's decline. Mother and Marylin knew that Mother was completely dependent on Marylin for care, and that this knowledge combined with Mother's decreasing mental faculties created a risk that Marylin could exercise undue influence over Mother.

### D. Marylin's Knowledge of her Role and Duties as Trustee

Marylin knew that Mother had executed an estate plan in January 2014 and amended it in May 2014. Marylin drove Mother to the attorney's office for the appointments and knew their purpose. Further, Marylin probably asked Dr. Badua to write the two letters about Mother's mental state in order to cement the validity of the January 2014 estate plan and the May 2014 amendment.

Marylin may not initially have known all of the contents of the trust and other documents, because the attorney met privately with Mother and did not talk to Marylin about the estate plan at the time. There can be no

U.S. Bankruptcy Court - Hawaii   #21-90012   Dkt # 76   Filed  12/09/22   Page 8 of 32

dispute, though, that Marylin knew and accepted that she was the trustee of the trust. In 2014, she (in her capacity as trustee of Mother's trust) sued her brother Remigio to evict him from Mother's Kailua home. The court entered a writ of possession on October 3, 2014, and a money judgment in favor of the trust and against Remigio on November 20, 2014. The court documents make it plain that Marylin was acting as trustee of the trust.

Marylin insists that she did not know what the trust agreement provided and did not know the duties of a trustee. She said that she thought the trust was like a "POA," or power of attorney. Marylin never asked anyone for a copy of the trust and never attempted to learn her duties as trustee even though she knew she was the trustee.

### E. Sale of Mother's Home and Marylin's Use of the Proceeds

Marylin and most of her siblings eventually agreed that Mother's house should be sold. The sale closed on April 8, 2016. Acting in her capacity as trustee of Mother's trust, Marylin signed the closing documents and received the net proceeds of $873,739.00. Based on the escrow officer's advice, Marylin opened a bank account for the trust and deposited the sale

U.S. Bankruptcy Court - Hawaii   #21-90012   Dkt # 76   Filed 12/09/22   Page 9 of 32

proceeds in it. She spent these funds in the following ways:

### 1. *Payment of Living Expenses for Mother and Marylin's Family.*

Before the sale of Mother's house closed, Marylin paid Mother's living expenses with a combination of Mother's Social Security benefits, the personal funds of Marylin and her husband, and perhaps rental proceeds from Mother's house (although one of her sisters may have received and kept some or all of the rental proceeds).

After the sale closed, Marylin used some of the proceeds to pay daily living expenses for Mother, Marylin, and Marylin's husband and children, and to reimburse herself for such expenses that Marylin had paid out of her own pocket before the sale closed. It is impossible to determine how much of the money Marylin used for Mother's living expenses, as opposed to the living expenses of Marylin and her husband and children, because Marylin never kept any record of the purposes for which she spent the money, and she made no effort to separate Mother's expenses from her own expenses.

### 2. *Settlement of the Diners' Lawsuit*

In October 2016, Marylin used $275,000 of trust money to settle a

10

lawsuit against her, her husband, their business, and two of their children (the "Diners' Lawsuit"). Marylin testified that her mother authorized this payment as a gift to Marylin and her immediate family in consideration of Marylin's promise to care for Mother in Marylin's house for the rest of Mother's life. For several reasons, I do not believe this testimony.

First, by October 2016 Marylin had so much influence over Mother that Mother's decisions were not fully voluntary. Mother's mental and physical condition had significantly deteriorated by October 2016 and she was entirely dependent on Marylin. She was also terrified of being placed in a care home so she was likely to do whatever Marylin wanted her to do. Marylin had every incentive to use her influence over Mother to get money from the trust in order to resolve the litigation.

Second, Marylin and her sisters all testified that, while Mother enjoyed giving gifts to her relatives (for example, when someone would visit her or on special occasions), those gifts were modest in amount and she was generally very careful with her money. It is not likely that Mother voluntarily gave Marylin such a large part of her total wealth simply in

U.S. Bankruptcy Court - Hawaii   #21-90012   Dkt # 76   Filed  12/09/22   Page 11 of 32

return for a promise for future care.

Based on all the evidence and the surrounding circumstances, I find that either Marylin took the $275,000 without Mother's approval, or she obtained Mother's approval by telling Mother that, if Mother did not provide the money to settle the lawsuit, Marylin would lose her home and would have to place Mother in a care home. Marylin knew that Mother was terrified of this and would do anything to avoid it. Therefore, if Mother agreed to give Marylin $275,000 to settle the lawsuit, she did so under Marylin's undue influence.

Marylin also fails to justify the way in which she structured the transaction. Marylin took the funds as a gift. This caused the value of the trust assets to immediately and permanently decrease with no benefit to the trust or the beneficiaries. Marylin could have easily structured this transaction as a loan rather than a gift. This would have accomplished the purported goal of settling the case to keep Mother in their home, while also preserving the trust's total assets. Instead, Marylin structured the transaction in a way that maximized the benefit to her personally at the

12

trust's expense.

### 3. Improvements to Marylin's Home

Between May and December 2016, Marylin used $222,500 of trust funds to add four bedrooms and three bathrooms to Marylin's house.

Marylin testified that Mother authorized her to use trust funds for that purpose. She testified that, when Mother first moved to Marylin's house, the house had only three bedrooms, which forced Mother to sleep in the living room. She testified that they built more bedrooms and bathrooms to make the house more comfortable for Mother. (Mother moved in to one of the new bedrooms in early 2017). Marylin explained that they built four new bedrooms and three new bathrooms, rather than one of each, so Mother's relatives could stay in the house and visit her.

This transaction was a misuse of the trust's assets. Some of the expense benefitted Mother: it was better for her to sleep in her own bedroom rather than in Marylin's living room. But there was no good reason for the trust to pay for more than one additional bedroom and bathroom. Marylin offered no evidence that visiting family members

13

stayed in her house for any significant periods.

Mother's purported authorization was probably not voluntary because, as I explain in the preceding section, Marylin had undue influence over Mother.

Further, Marylin has not explained why it was reasonable for the trust to give her the money to pay for the improvements rather than lend it to her or acquire an ownership interest in the house in return for the trust's outlays. Marylin again chose the structure most beneficial to her personally and most detrimental to the trust.

Marylin and her husband sued the contractor and architect who handled the construction. They used trust funds for the survey to determine the extent of the faulty workmanship. However, while they recovered a judgment of $300,000, they are collecting payments personally and not turning them over to the trust.

### 4. *Purchase of a Vehicle*

Marylin and her husband owned two vehicles. Marylin testified that it was difficult to transfer Mother from her wheelchair into those vehicles,

14

so she used $24,326.22 of trust money to buy a used vehicle that was more suitable to transport Mother.

Although Marylin purchased the car with trust money, she did not place title to the car in the trust. She also kept the car even after Mother passed away, rather than selling it and returning the proceeds to the trust.

Once again, Marylin arranged the transaction in a way that maximized the benefit to her personally at the expense of the trust. While it may have been reasonable to purchase a suitable car for Mother, Marylin should have made the car an asset of the trust or sold it after Mother passed away and transferred the proceeds to the trust.

5. *Other Transactions*

Marylin used a substantial amount of trust funds to pay for local outings and trips to Las Vegas for Mother, Marylin, and other family members. It was probably reasonable for Marylin to use some of the trust money to pay for Mother's recreation and gatherings with her family members. But because Marylin failed to keep any records of her use of the trust funds, it is impossible to determine how much of these expenses are

15

appropriate.

Marylin testified that Mother approved all of these expenses. I have found, however, that for most of this period, Mother's mental capacity was diminished and she was subject to Marylin's undue influence.

Marylin testified that she used trust funds to make gifts to family members and others. She has provided checks showing $15,100.00 of such gifts. She claims that she made additional gifts in cash, or wrote checks to reimburse other parties for gifts they had given on the trust's behalf. But Marylin provided no documentary corroboration for this claim.

### F. Mother's Hospitalization and Passing

In May 2017, Mother fell ill and Marylin took her to the emergency department at Castle Medical Center. The physician's notes say that Marylin was the source of Mother's medical history, that Mother was uncommunicative, and that Mother had a history of dementia. The physician wrote these notes based upon what Marylin told the physician. This confirms that, by May 2017 at the latest, Marylin knew that Mother's mental condition had significantly deteriorated.

16

Mother was hospitalized again in June 2018. She was diagnosed (for the first time) with a brain tumor and she passed away on June 30, 2018.

On June 21, 2018, a few days before Mother passed, Marylin closed the trust's bank account and deposited the remaining funds ($42,109.69) in her husband's bank account. She testified at trial she did this to make sure that the remaining trust funds were available to pay for Mother's final expenses, her funeral, and related events, and that most of the money was used for those purposes. She provided no documentation whatsoever of her use of these proceeds.

She further testified that she took the money out of the trust account because she was seriously ill at that time, she was not sure she would survive to use the remaining trust funds for proper purposes, and she did not trust her siblings to do so. I do not believe this explanation. If Marylin truly intended to use the money for proper trust purposes, she would be able to produce some corroboration for her testimony about her use of the money. She has not produced a shred of corroborating evidence. I find that she took the remaining trust money just prior to Mother's passing to ensure

17

it went to herself, her husband, and her children and was not distributed to her siblings as the trust required.

### G. Marylin's Intentions and Mental State

I find that soon after the house was sold, Marylin decided that she was entitled to all of the trust money to compensate herself for caring for Mother. Marylin knew that she was trustee of Mother's trust but she was bound and determined to use the trust money for her benefit (and the benefit of her husband and children) regardless of what the trust agreement required.

I make this finding because that is the way that Marylin behaved. She routinely withdrew thousands of dollars from the trust account as reimbursements to herself, whenever it was convenient for her to do so. She did not keep any records showing the purpose or legitimacy of the expenditures. She admitted that she used the trust's money, not just to pay Mother's living expenses, but also the personal and business expenses of her husband, herself, and her children. In short, she treated the trust account simply as another personal account.

U.S. Bankruptcy Court - Hawaii   #21-90012   Dkt # 76   Filed   12/09/22   Page 18 of 32

Marylin's own testimony supports this finding. She testified that she used the money to pay for her own care because only by caring for herself would she be able to care for Mother. This is a rationalization, not a justification for her self-dealing and misuse of trust assets.

A series of text messages that Marylin sent to her siblings in early April 2017 (exhibits P-49, P-50, and P-51) is telling. Marylin sarcastically thanked one of her siblings for sending Adult Protective Services to her home to check up on Mother, raged at her siblings for failing to share in the burden of caring for Mother, accused them of being interested only in Mother's money, and emphasized her power as trustee to "donate, gift, invest and bookkeeping is waived." These text messages are important for several reasons. First, they establish that Marylin intended to use the trust money as she pleased, regardless of the other beneficiaries' rights. Second, her paraphrase of the language of the trust agreement shows that she knew something about its terms. But she made no effort to comply with it. Third, the statement "bookkeeping is waived" shows that her failure to keep records of trust expenditures was not a mistake but rather was deliberate.

19

In short, she either consciously disregarded or was willfully blind to her obligations and engaged in conduct that was certain to violate those obligations.

Perhaps the clearest example of Marylin's treatment of the trust's money as her own is the final withdrawal and closing of the account. After Mother was hospitalized and diagnosed with a terminal brain tumor, Marylin withdrew the remaining proceeds and transferred them to a personal family account. She did this because she did not want her siblings to receive a penny from the trust.

In a sense, one can understand her point of view: providing years of twenty-four-hour care for a person who is elderly, wheelchair-bound, and fragile is arduous and praiseworthy. Marylin did everything her mother needed, and the burden she shouldered should not be understated. Paying a third party to care for Mother probably would have exhausted the trust's funds before she passed away. But this does not entitle Marylin to simply use the funds as she saw fit. The trust agreement did not authorize Marylin to decide unilaterally to pay herself for her work as trustee or as caregiver,

20

and Marylin never attempted to obtain her siblings' consent or probate court approval for a compensation arrangement.[3]

### H. Probate Court Proceedings

After Mother's passing, Villia requested a copy of the trust from Marylin. Marylin regarded Villia's request as a joke and ignored it.

In May 2019, Villia filed a petition in state probate court to compel Marylin to produce copies of the trust agreement and to provide an accounting for her administration of the trust. The court granted the petition in August 2019.

Marylin eventually filed a Final Account. But Marylin's conduct makes it impossible to verify the accuracy of the Final Account or to confirm that the expenditures listed in the account were proper uses of the trust's funds. For example, the information in the column labeled

_____

[3] Based upon my observation of the witnesses at trial, I find it inconceivable that the siblings would have agreed on anything, let alone an arrangement under which Marylin would have received the bulk of Mother's money. But the fact that her siblings would very likely not have consented does not justify Marylin's self-interested decision to take all of the money without even seeking consent or petitioning the probate court for relief.

21

"Description of Transaction" came from Marylin's memory and not from contemporaneous records or receipts. Marylin testified at trial that she no longer remembers many of the transactions and she no longer has (and I find that she probably never kept) receipts or other backup documentation. Many of the "reimbursements" that Marylin gave herself are for round amounts that almost certainly do not represent exact amounts that Marylin spent for Mother's benefit. And she admitted at trial that she used trust money to pay living expenses, not only for Mother, but also for herself, her husband, and her children.

After further litigation, the probate court entered an order (the "Probate Court Order") in which it held that Marylin had not complied with its prior order to provide a complete trust accounting with backup records and that she "violated her fiduciary duties" and "misappropriated and misused trust funds while serving as Trustee of [Mother's] Trust, and a surcharge is necessary." The court removed Marylin as trustee of the trust, appointed Villia as her successor, and decided that a trial should be held to determine the amount of the surcharge. Before the state court trial was

U.S. Bankruptcy Court - Hawaii   #21-90012   Dkt # 76   Filed  12/09/22   Page 22 of 32

held, Marylin filed her bankruptcy case, invoking the automatic stay.

## II.    CONCLUSIONS OF LAW

### A. Section 523(a)(4)

One of the major policy objectives of the bankruptcy code is to provide the "honest but unfortunate" debtor with a fresh start. *Peterson v. Lusk (In re Lusk)*, 589 B.R. 678, 683 (Bankr. E.D. Cal. 2019). Accordingly, the discharge provisions of the bankruptcy code are interpreted liberally in favor of debtors. *See id.*

A creditor seeking to except a debt from the debtor's discharge bears the burden of proof to establish by a preponderance of evidence all of the elements of the statutory exception to discharge upon which the creditor relies. *See Grogan v. Garner*, 498 U.S. 279, 290 (1991).

Under section 523(a)(4), a debtor may not obtain a bankruptcy discharge for a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Neither embezzlement nor larceny have been alleged in the present case. A debt is non-dischargeable under this section for defalcation where: "1) an express trust existed, 2) the debt

U.S. Bankruptcy Court - Hawaii   #21-90012   Dkt # 76   Filed  12/09/22   Page 23 of 32

was caused by fraud or defalcation, and 3) the debtor acted as a fiduciary to the creditor at the time the debt was created." *Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1459 (9th Cir. 1997), *abrogated on other grounds, Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013). In addition, the Supreme Court has held that the term "defalcation" – as it is used in this section – "includes a culpable state of mind requirement . . . involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Bullock*, 569 U.S. at 269. The Court went on to explain:

> [W]here the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent . . . Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary consciously disregards (or is willfully blind to) a substantial and unjustifiable risk that his conduct will turn out to violate a fiduciary duty. That risk must be of such a nature and degree that . . . its disregard involves a *gross deviation* from the standard that a law-abiding citizen would observe in the actor's situation.

*Id.* (cleaned up, emphasis in original).

## B. Partial Summary Judgment

The Probate Court Order establishes some of the elements of Villia's case. On a motion for partial summary judgment, I held that the Probate Court Order has issue preclusive effect and determines that Mother's trust was valid, that Marylin was trustee of the trust, and that Marylin violated her fiduciary duties and misappropriated and misused trust funds while serving as Trustee of the Trust. [4] But the Probate Court Order did not determine the amount of Marylin's liability and did not include a finding that Marylin acted with the mental state required for "defalcation" under the Bankruptcy Code.

## C. Marylin's Scienter

I have found that Marylin harbored the mental state required by

_____

[4] Issue preclusion is appropriate where: (1) the issue decided in the prior litigation is identical to the one presented in the present action; (2) there is a final judgment on the merits; (3) the issue decided in the prior adjudication was essential to the final judgment; and (4) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication. *Dorrance v. Lee*, 976 P.2d 904, 910 (Haw. 1999). The Probate Court Order was not a "final" judgment in the sense that it was not immediately appealable, because it did not decide the issue of damages. But a judgment can have issue preclusive effect even though it is not

U.S. Bankruptcy Court - Hawaii   #21-90012   Dkt # 76   Filed  12/09/22   Page 25 of 32

*Bullock*. She knew that she was the trustee of Mother's trust. By April 2017 at the latest, she was familiar with at least some of the terms of the trust and her obligations as trustee. If she was ever unaware of her duties as trustee, it was because she chose not to learn of those duties. She could not have believed that she had a legal right to use almost all of the trust's money for the personal benefit of herself, her husband, and her children. She consistently arranged transactions in a way that maximized the personal benefit to her and also maximized the harm to the trust.

The facts of this case are far more egregious than the facts of *Bullock*. Mr. Bullock was the trustee of his father's trust, the only asset of which was an insurance policy on his father's life. He borrowed money from the trust three times, each time for the benefit of himself and his mother. He "saw that all of the borrowed funds were repaid to the trust along with 6%

---

appealable. "[F]or purposes of issue preclusion (as distinguished from merger and bar), 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." Restatement (Second) of Judgments § 13 (1982). *See Malahoff v. Saito*, 140 P.3d 401, 414 n.16 (Haw. 2006) (stating a rule similar to the Restatement but holding that it did not apply to the preliminary injunction in question).

U.S. Bankruptcy Court - Hawaii   #21-90012   Dkt # 76   Filed  12/09/22   Page 26 of 32

interest." *Id*. at 270. Thus, the trust suffered no loss of assets. But some of his siblings sued Mr. Bullock, alleging that Mr. Bullock breached his fiduciary duty to the trust by engaging in self-dealing and that Mr. Bullock should be required to pay to the trust the benefits that Mr. Bullock received from the trust. The state court agreed, holding Mr. Bullock liable for his "failure . . . to make [the] trust more than whole." *Id*. at 273. Unlike Mr. Bullock, whose conduct did not reduce the trust's assets by a penny, Marylin completely drained Mother's trust, leaving it with nothing.

Holding Marylin's debt nondischargeable is also consistent with the Court's policy concerns in *Bullock*. The Court adopted the scienter requirement for several reasons, one of which was to protect "*nonprofessional* trustees, perhaps administering small family trusts potentially immersed in intrafamily arguments that are difficult to evaluate in terms of comparative fault." *Id.* at 276. It is true that Marylin is a nonprofessional trustee and that she is immersed in intrafamily arguments. But she did not merely fail to follow trust requirements that a typical lay person would not understand. Nor did she merely commit simple mistakes

or errors of judgment. Rather, she purposely set out to take for herself as much of the trust assets as she could. This is not the kind of trustee behavior that the *Bullock* court sought to protect.

This case is very similar to *Pearl v. Pearl (In re Pearl)*, 502 B.R. 429, 444 (Bankr. E.D. Pa. 2013). *Pearl* involved a daughter-trustee who sacrificed a significant amount to care for her aging mother. She removed her mother from an uninhabitable home, redeemed the property from a tax sale and made the property saleable, acquired another home for her mother, and provided routine care for her mother. But the court found that the daughter committed defalcation by misusing the proceeds of sale of her mother's home:

> Debtor depleted her mother's accounts. She wrote checks out to cash for herself and engaged in transactions that unduly benefitted herself. She commingled Estate assets with her own. She did little to track the flow of Estate money and failed to maintain adequate records of her activities. She failed to file mandated reports with the [Common Pleas] Court. Overall, her conduct involved an extreme departure from the negligence standard to which fiduciaries are held, and bordered on out-and-out self dealing. In this course of this conduct, the Debtor, at a minimum, blinded herself to a substantial and unjustifiable risk that her conduct would violate her fiduciary duty to manage the Estate assets faithfully and prudently.

28

This case presents an excellent illustration of the "recklessness" scienter level described by the Supreme Court in *Bullock.* On the whole, the record does not support a finding that the Debtor acted in bad faith, immorally or with a clear intent to steal from her mother's Estate. Nor is the evidence overwhelming that she subjectively and consciously understood that all of her actions fell short of her legal duties as guardian. But given the number of shortcomings in her management of the Estate and the degree to which she fell short in carrying out her duties, the evidence strongly supports the finding that the Debtor acted recklessly while serving as her mother's financial guardian.

*Id*. at 447.

Much like the daughter in *Pearl*, Marylin provided excellent care for Mother and bore substantial physical, psychological, and financial burdens in doing so. But she completely disregarded her duties concerning the funds in Mother's trust, using most of them for her personal benefit. The pervasive scope of her disregard, and the text messages she sent to her siblings, make clear that her conduct was at least reckless.

Marylin attempts to justify many of her expenditures by claiming that Mother authorized them. But the trustee should not follow the direction of a settlor-beneficiary if there was reason to doubt the validity of the instruction or authorization. *Cloud v. U.S. Nat. Bank of Oregon*, 280 Or.

29

83, 90 (1977). Marylin knew that Mother's mental state had declined and that Mother's total dependence on Marylin gave Marylin undue influence over Mother.[5] Even if Mother authorized some or all of the expenditures, Marylin was not entitled to rely on those instructions.

Therefore, I conclude that Marylin acted with the scienter required by *Bullock*.

### D. Surcharge Calculation

During Marylin's trusteeship, the assets of the trust fell from $873,739.00 to zero. I hold that Marylin should be surcharged for almost that full amount and that the surcharge obligation is a "debt . . . for . . . defalcation while acting in a fiduciary capacity" under section 523(a)(4).

Part of these expenditures were probably for appropriate trust

---

[5] Under Hawaii law, the elements of undue influence are susceptibility of the transferor, opportunity for the exertion of undue influence, disposition to exert undue influence, and the result of such undue influence. *See In re Estate of Herbert*, 979 P.2d 39, 53 (Haw. 1999). As set out in the Findings of Fact, Mother's mental state and Marylin's knowledge and disposition to exploit that condition meet these requirements.

purposes. For example, it is undisputed that Marylin used trust funds to pay for Mother's necessary living expenses. It is also possible that a portion of the cost of the home improvements and the car could be appropriate trust expenses: Mother did benefit from the use of the car and a portion of the home improvement during her lifetime. But Marylin offered no evidence, and kept no records, showing the portion of those expenses that the trust should have paid. Her failure to keep records was not an innocent mistake but rather was part of her deliberate effort to avoid accountability for her conduct.

Villia bears the burden of proving all of the elements under section 523(a)(4). *See, e.g., Peterson v. Lusk (In re Lusk)*, 589 B.R. 678 (Bankr. E.D. Cal. 2018); *Moore v. Moore (In re Moore)*, No. 12-10802-A-7, 2014 WL 3570600 at *6 (Bankr. E.D. Ca. July 18, 2014). But Villia should not be obligated to disprove Marylin's uncorroborated assertion that some of the expenses were appropriate. "[W]here a trustee has failed to keep accurate and timely records, as is the case here, all presumptions must be taken against the trustee in determining damages." *Maue v. Maue*, 611 B.R. 367, 387 (Bankr.

U.S. Bankruptcy Court - Hawaii   #21-90012   Dkt # 76   Filed  12/09/22   Page 31 of 32

W.D. Wash. 2019). Marylin is the only one who ever had any information about her use of the trust's funds. Further, Marylin's failure to keep and maintain records of the trust's expenditures is itself a defalcation of her duties as trustee. *See id.*

The trust instrument authorized Marylin, as trustee, to make gifts using the trust's funds. Marylin has provided records confirming that she made such gifts in the total amount of $15,100.00. Marylin should not be surcharged for this amount.

## III. CONCLUSION

Based upon the above findings of fact and conclusions of law, judgment will be entered in favor of Villia in her capacity as successor trustee of Mother's trust and against Marylin in the amount of $858,639.00. This represents the amount that Marylin expended from the trust account ($873,739.00) less the verified gifts ($15,100). That sum is not dischargeable in bankruptcy. Counsel for Villia shall prepare and circulate a proposed final judgment.

**END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW**

U.S. Bankruptcy Court - Hawaii   #21-90012   Dkt # 76   Filed  12/09/22   Page 32 of 32